United States District Court
Southern District of Texas

**ENTERED**

June 18, 2025

Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| MARY TOLMAN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 1:24-CV-099 |
| | § | |
| BROWNSVILLE INDEPENDENT SCHOOL | § | |
| DISTRICT, | § | |
| | § | |
| Defendant. | § | |

## <u>ORDER AND OPINION</u>

Plaintiff Mary Tolman brings this lawsuit against the Brownsville Independent School District (BISD) alleging that BISD constructively discharged her after she reported misappropriations of federal grant monies.[1]  Tolman alleges violations of whistleblower protections under federal and state statutes, violations of the Equal Pay Act, and a claim under 42 U.S.C. § 1983 for the alleged violation of her substantive due process rights under the Fourteenth Amendment of the United States Constitution.

BISD requests dismissal of all of Tolman's causes of action. (Motion, Doc. 20)  Based on the applicable law and Tolman's allegations, the Court concludes that only Tolman's claims under the National Defense Authorization Act of 2013 and the Equal Pay Act survive the motion to dismiss.

---

[1] Tolman named several individuals as defendants in her Original Complaint (Doc. 1), but includes only BISD as a defendant in her First Amended Complaint (Doc. 19).  The Court finds that Tolman, by way of her amended complaint, voluntarily dismissed her claims against the removed individuals. *See, e.g.*, *Conley v. Mary Francis Hurt Conley Wright*, No. 4:24-CV-00135-ALM-BD, 2024 WL 5320154 (E.D. Tex. Nov. 25, 2024) (concluding that because the amended complaint made no mention of eight business-entity defendants named in the original complaint, the amended complaint abandoned the claims against those defendants); *Doyle v. Beauregard Par. Sheriff's Off.*, No. CIV.A.08-1412, 2009 WL 2588349 (W.D. La. July 14, 2009), *report and recommendation adopted*, No. 2:08CV01412, 2009 WL 2588386 (W.D. La. Aug. 20, 2009) ("However, by way of amended complaint, plaintiff has dismissed his claims against those individuals."); *see also Lampkin v. Staffmark*, 577 F. App'x 295, 296 n. 1 (5th Cir. 2014) ("Although Lampkin originally also sued Veronica Garcia and Lindsey Miller, they were never served, and she intentionally deleted them in her amended complaint, stating in her motion for leave: 'Plaintiff wishes to allege her Complaint against the entity only.' Thus, they are not before us on this appeal.").  In any event, her claims against the individuals in their official capacity would amount to a suit against the entity–in this case, BISD–and would be duplicative of her claims against BISD. *See Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 n. 3 (5th Cir. 1996).

I.    **Allegations and Procedural History**[2]

Plaintiff Mary Tolman served as Special Programs Director within the Brownsville Independent School District and oversaw BISD's administration and use of federal funds.  Her responsibilities included three areas relevant to this lawsuit:

(a) 'assisting' the oversight of the District's administration and use of the [Every Student Succeeds Act] Funds provided by [the Texas Educational Agency];

(b) overseeing implementation of said funds to maintain effective internal control over the federal award that provides reasonable assurance that the district is managing the award in compliance with federal statutes, regulations, and the terms and conditions of the award; and

(c) take prompt action when required when noncompliance with federal and/or state guidelines are identified, including any noncompliance which may be identified in audit findings.

(First Am. Compl., Doc. 19, ¶ 9)

At some point before March 2021, Tolman "observed several suspicious inappropriate uses of federal grant monies" by BISD employees. (*Id.* at ¶ 13)  Based on the school district's policies, Tolman reported her suspicions to the Administration, copying her direct supervisor.  Shortly after her report, BISD requested a review of all absences that Tolman had taken.

On June 16, Tolman submitted her report to the Superintendent at the time.  Within a week, BISD revoked her access to the TalentED computer program, which Tolman required to complete her job duties.  And after another week passed, BISD Administrators pressured her to improperly switch the designation of personnel funds to federal funds.

At this point, Tolman invoked the administrative grievance process.  Under BISD's policy, employees could report a grievance against a supervisor "if the employee alleges that the supervisor (1) violated the law in the workplace; or (2) unlawfully harassed the employee." (*Id.* at ¶ 11 (quoting BISD Board Policy Manual, DGBA–Personnel-Management Relations: Employee

---

[2] At the motion to dismiss stage, a district court accepts a plaintiff's well-pleaded allegations as true. *See Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011).

Complaints/Grievances))[3]   A three-level system governed grievances.   Employees typically initiated the grievance procedure with a Level I grievance, which an administrator heard.   Level II represented a review of the Level I decision.   The Superintendent or a designee decided a Level II grievance.   The Level III grievance, heard by the BISD school board, reviewed the Level II decision.   The school board could "give notice of its decision orally or in writing at any time up to and including the next regularly scheduled Board meeting." *See* BISD Board Policy Manual. When the school board did not render a decision at a regularly-scheduled Board Meeting, "the lack of response by the Board uph[eld] the administrative decision at Level Two." *Id.*

On September 9, in accordance with the Board Policy Manual, a BISD administrator held a Level I grievance hearing regarding Tolman's allegations of BISD's misconduct and its treatment of her.   BISD "summarily denied" the grievance, but assured Tolman "that she would not be subjected to any form of retaliation" for invoking the process. (First Am. Compl., Doc. 19, ¶ 16)

Tolman does not describe the result of the Level I grievance, but in October, she initiated a Level II grievance, allowing the inference that the Level I grievance ended adverse to her interests.   In addition, she separately reported her suspicions of financial misappropriation to the Texas Educational Agency.

On October 21, the Superintendent (or his designee) denied Tolman's Level II grievance. The same day, she received a Letter of Reprimand from the school district, claiming that she had failed to cooperate with an internal audit regarding the misapplied federal funds.   Contrary to the

---

[3] Tolman references, but does not submit the BISD Board Policy Manual for grievance procedures.   The document can be accessed online at: https://pol.tasb.org/PolicyOnline/PolicyDetails?key=254&code=DGBA#legalTabContent.   The Board adopted the current version after the events that Tolman alleges, but the parties have not indicated that the current policy differs materially from those in effect during the relevant time period.   In addition, district courts may take judicial notice of matters of public record, such as a school district's Board Policy Manual. See *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019) ("Judicial notice may be taken of matters of public record."); *Cantwell v. Sterling*, 788 F.3d 507, 509 (5th Cir. 2015) (taking judicial notice of grievance procedures in inmate handbooks); *Firefighters' Ret. Sys. v. EisnerAmper, L.L.P.*, 898 F.3d 553, 558 (5th Cir. 2018) (taking judicial notice of state board records); *Coleman v. Dretke*, 409 F.3d 665, 667 (5th Cir. 2005) (explaining that courts can take judicial notice of a state agency's website).

accusation in the Letter of Reprimand, Tolman had provided the requested information to the auditor the previous week.

"Upon receiving the Letter of Reprimand . . . , [Tolman] supplemented her original filing to TEA with a report, specifically identifying the blatant retaliation being effectuated upon her by [BISD] for advising of the financial misappropriations uncovered by her." (*Id*. at ¶ 18)  She also sent the report to BISD and its Trustees and Administrators.  The next day, BISD summoned her to a meeting with the Administrators and several high-ranking employees.  The participants "acknowledged . . . during this meeting that [Tolman's] complaints were meritorious, and necessitated further investigation." (*Id*.)

Several months elapsed, during which Tolman observed "no substantive changes[.]" (*Id*. at ¶ 19)  In March 2022, she "receiv[ed] reports from within the District of improper changes to job titles and duties, in an improper attempt to once again access federal funding." (*Id*.)  As the changes had occurred without Tolman's consent or knowledge, she reported the matter to her supervisors.   In response, BISD excluded her "from any meetings held to address the discrepancies." (*Id*.)  By the end of the month, BISD began taking actions that prevented Tolman from performing a significant part of her job.  For example, they overrode her right to access employee accounts and failed to provide her necessary information to process staff members being paid with federal funds.

In June, BISD's Deputy Superintendent Dr. Nereida Cantu reassigned Tolman from her position as Special Programs Director to Coordinator of the Migrant Education Department.  Although Cantu indicated that Tolman would be filling a vacancy, no such vacancy existed.  As Coordinator, Tolman retained her salary for the remainder of the 2022−23 school year, but would experience a $22,000 decrease for 2023−24, and would be ineligible to earn stipend pay.  As for the vacated Director position, BISD filled it with a male employee who was less qualified than Tolman.

In early July, Tolman "was reassigned to a dirty, stale-smelling office, with termites, dead roaches, rodents, and their feces on the floor, desk, and drawers, and rodents skeletal remains and fluid stains . . . in her office air-conditioning unit." (*Id.* at ¶ 23)  On July 13, she submitted a Level II grievance "protesting her demotion/'constructive discharge'."[4] (*Id.* at ¶ 24)  Five days later, she "continued to alert all necessary authorities of the fiscal malfeasance and misappropriation of federal funds being perpetrated at the District." (*Id.*)  The same day, she met with BISD auditors regarding her whistleblower complaints.

During this time period, Tolman also initiated a complaint against BISD with the Office of Inspector General (OIG) in the United States Department of Education.

On August 1, at the Level II grievance hearing, District Staff Attorney Miguel Salinas "made a retaliatory statement that [Tolman's] Whistleblower reports were made in bad faith[.]" (*Id.* at ¶ 27)

In fall 2022, BISD continued to retaliate against Tolman, such as by excluding her from administration policy meetings that "directly impacted her new position." (*Id.* at ¶ 26)  Then, in October, she received a "late employment evaluation" that "was markedly worse than any such evaluation [she] had received during her tenure as Director of Special Programs[.]" (*Id.*)  And three weeks later, the District's Chief Financial Officer rejected, without explanation, Tolman's proposed budget for the Migrant Education Program.

On November 1, BISD served Tolman with a Letter of Concern "accusing [her] of, in part, making false allegations to various employees within the District." (*Id.*)  Two weeks later, Tolman filed an administrative grievance objecting to the Letter of Concern.

On November 18, OIG informed Tolman that it would "not investigate [her] whistleblower complaint and [would] take no further action pursuant to 41 U.S.C. § 4712(b)(1)[,]" as her complaint had been addressed in the BISD administrative proceedings. (OIG Letter, Doc. 19, 24)

---

[4] Tolman does not specify whether or when she initiated a Level I grievance as to these matters.

Toward the end of the school calendar, in May 2023, BISD notified Tolman of the $22,000 decrease in pay for the 2023-2024 term. And she received a "below expectations" job performance review in her Coordinator position. (First Am. Compl., Doc. 19, ¶ 27)

On June 29, Tolman "had no choice but to resign[,]" doing so "under duress." (*Id.* at ¶ 29)

Almost a year later, on May 7, 2024, "the Level III grievance" concluded, presumably adverse to Tolman. (*Id.* at ¶ 37) On July 1, Tolman initiated this action.

BISD filed a Motion to Dismiss (Doc. 12), which the Court denied as moot after Tolman submitted a First Amended Complaint (Doc. 19). BISD then presented the pending Motion to Dismiss (Doc. 20).

## II.    Standards of Review

BISD seeks dismissal under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

Under Rule 12(b)(1), a court must dismiss an action for lack of subject matter jurisdiction when the court possesses no statutory or constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). When a party moves under multiple provisions of Rule 12(b), "the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). "In reviewing a motion to dismiss for lack of jurisdiction, the court may consider any of the following: (1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Sissom v. Univ. of Texas High Sch.*, 927 F.3d 343, 348 n. 1 (5th Cir. 2019) (internal quotation marks omitted).

To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); Fed. R. Civ. P. 12(b)(6). A plaintiff satisfies the facial plausibility standard by pleading "factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The allegations in the complaint are not required to be thoroughly detailed, but must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  A court considers only the allegations in the complaint and must accept them as true, viewing them in the light most favorable to the plaintiff. *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 816 (5th Cir. 2012).  If the allegations are sufficient "to raise a right to relief above the speculative level," the court will not dismiss the cause of action. *Twombly*, 550 U.S. at 555.

## III.  Analysis

Tolman alleges four causes of action against BISD: (1) violations of the National Defense Authorization Act of 2013 (NDAA), 41 U.S.C. § 4172; (2) violations of the Texas Whistleblowers Act (TWA), TEX. GOV. CODE § 554.002(a); (3) violations of the Equal Pay Act, 29 U.S.C. § 206; and (4) violations of her substantive due process rights under the Fourteenth Amendment of the United States Constitution, pursuant to 42 U.S.C. § 1983.  BISD seeks dismissal of each claim.

### A.  NDAA

Tolman alleges that BISD's conduct violated the NDAA, which prohibits any recipient of federal funding from retaliating against whistleblowers who report an abuse of that money. *See Texas Educ. Agency v. United States Dep't of Educ.*, 992 F.3d 350, 353 (5th Cir. 2021).  Tolman contends that BISD is a federal subcontractor and grantee of federal funds subject to the NDAA, and that after she reported her suspicions of fiscal malfeasance, BISD violated the law by placing her under increased scrutiny, demoting her, and pressuring her to resign, resulting in her constructive discharge. (First Am. Compl., Doc. 19, ¶ 33)

In its Motion, BISD presents a jurisdictional challenge, arguing that the state of Texas has not waived its sovereign immunity as to Tolman's NDDA claim, and that the doctrine bars the cause of action. (Motion, Doc. 20, 4–6 (citing *Texas Educ. Agency*, 992 F.3d at 360))  In response, Tolman disputes that BISD receives the protection of  constitutional sovereign immunity.

"The Eleventh Amendment recognizes the background constitutional principle that states, as separate sovereigns, are inherently immune from suit without their consent." *Springboards to Educ., Inc. v. McAllen Indep. Sch. Dist.*, 62 F.4th 174, 178 (5th Cir. 2023). A state's sovereign immunity extends to "so-called arms of the state, entities which are effectively the state itself because 'the state is the real, substantial party in interest' to the lawsuit." *Id.* at 179 (quoting *Hudson v. City of New Orleans*, 174 F.3d 677, 681 (5th Cir. 1999)). To determine whether an entity is an "arm of the state," courts apply a six-part balancing test: (1) whether state statutes and case law view the entity as an arm of the state; (2) the source of the entity's funding; (3) the entity's degree of local autonomy; (4) whether the entity is concerned primarily with local, as opposed to statewide, problems; (5) whether the entity has the authority to sue and be sued in its own name; and (6) whether it has the right to hold and use property. *See Clark v. Tarrant County*, 798 F.2d 736, 744–45 (5th Cir. 1986). Courts consider these factors "as a whole," but "[t]he second factor carries the most weight, while factors five and six are of lesser importance." *Springboards*, 62 F.4th at 179. BISD bears the burden of demonstrating that it is an arm of the state entitled to Eleventh Amendment sovereign immunity. *See id.*; *Skelton v. Camp*, 234 F.3d 292, 297 (5th Cir. 2000).

The first factor requires the Court to examine how the state, through its constitution, laws, and other official pronouncements, perceives BISD. *See Springboards*, 62 F.4th at 179 (citing *Hudson*, 174 F.3d at 683). This initial factor favors BISD, as Texas courts have recognized that independent school districts are "part of the state itself and therefore enjoy state sovereign immunity." *Id.* at 183 (citing *Love v. City of Dallas*, 120 Tex. 351, 40 S.W.2d 20, 26 (1931); *Barr v. Bernhard*, 562 S.W.2d 844, 846 (Tex. 1978) (stating that it is "well settled in this state that an independent school district is an agency of the state")).

The second factor weighs against the application of sovereign immunity. In connection with this factor, the "Eleventh Amendment is concerned only about the potential impact on the

state treasury." *Id.* at 180.  The factor carries the most weight "because one of the Eleventh Amendment's central purposes is to protect state treasuries from involuntary liability." *Id.*  "[T]he funding inquiry 'concerns whether the state is directly responsible for a judgment or indemnifies the defendant.'" *Id.* (internal quotations omitted).  Courts apply a two-part inquiry: (1) "the state's liability in the event there is a judgment against the defendant[,]" and (2) "the state['s] liability for the defendant's general debts and obligations." *Vogt v. Bd. of Comm'rs of Orleans Levee Dist.*, 294 F.3d 684, 693 (5th Cir. 2002).  Here, relevant authorities indicate that any judgment against BISD would have no little to no impact on the state treasury.  Generally, the Texas "public education system is financed by ad valorem taxes generated by local school districts and supplemented with state funds," but "[a] judgment against a school district must be paid from the funds of the school district, whether generated locally or appropriated by the State, not from the state treasury." *San Antonio Indep. Sch. Dist. v. McKinney*, 936 S.W.2d 279, 284 (Tex. 1996) (citing TEX. EDUC. CODE §§ 42.101–.105, .251–.253, .302–.303).  In addition, BISD possesses the authority to levy taxes and issue bonds under the Texas Education Code. *See Springboards*, 62 F.4th at 183–84; TEX. EDUC. CODE §§ 45.001–02.  Thus, the most significant factor weighs against immunity.

The third factor, which considers whether the entity is autonomous or controlled by the state, supports BISD's position.  Courts analyze the independence of the defendant entity and its managers, with greater independence weighing against immunity. *See Vogt*, 294 F.3d at 694.  In Texas, the state exercises extensive oversight of local school districts. *See Springboards*, 62 F.4th at 184 (citing TEX. EDUC. CODE § 39A.001 (subjecting school districts to state accreditation and academic performance financial accountability standards); § 39A.005 (authorizing the state to close a noncompliant district and annex it to an adjoining district); § 28.002 (establishing curriculum standards); § 34.002–03 (setting out statewide bus safety standards)).  The state's broad oversight and control over BISD counsels in favor of immunity.

Tolman finds support in the final three factors.  The fourth consideration turns on "whether the entity acts for the benefit and welfare of the state as a whole or for the special advantage of local inhabitants." *Pendergrass v. Greater New Orleans Expressway Comm'n*, 144 F.3d 342, 347 (5th Cir. 1998).  If a school district serves only a "geographically limited communit[y,]" the factor weighs against immunity.  Factor five analyzes whether the defendant entity can sue and be sued in its own name.  This factor, which "carries little weight, . . . points against immunity" if the entity "has a history of suing [or being sued] in its own name." *Springboards*, 62 F.4th at 182.  The final factor asks whether the entity can hold and use property, with the entity's ability to do so weighing against immunity. *Id.*  In the present case, BISD serves a geographically limited community and concerns itself primarily with serving students in Cameron County.  The District possesses the authority to sue and be sued in its own name, as well as the right to hold and use property. *See* Tex. Educ. Code § 11.151(a) (stating that trustees of an independent school district "in the name of the district may acquire and hold real and personal property [and] sue and be sued").  Thus, these factors all weigh against a finding of immunity.

The Court finds that only factors one and three favor a finding of immunity, with the remaining factors, including the most important second factor, cutting against immunity. Balancing these factors, the Court concludes that BISD does not enjoy sovereign immunity under the Eleventh Amendment.  This conclusion finds support in decisions reached by other federal courts who have considered whether a Texas school district receives sovereign immunity. *See, e.g.*, *Springboards*, 62 F.4th at 178 (affirming the district court's finding that the McAllen Independent School District was not entitled to sovereign immunity); *Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 596 (5th Cir. 2006) ("Generally, school boards and districts are not arms of the state shielded by Eleventh Amendment immunity."); *Lopez v. Houston Indep. Sch. Dist.*, 817 F.2d 351, 353 (5th Cir. 1987) (finding that a Texas independent school district was "sufficiently

distinct from the state to be outside the [E]leventh [A]mendment"), *overruled on other grounds*, *Walton v. Alexander*, 44 F.3d 1297, 1303 n. 4 (5th Cir. 1995) (en banc).

As a result, BISD does not possess immunity against Tolman's claims brought under the NDAA.

### B. Texas Whistleblowers Act

Tolman alleges that BISD's conduct against her violated the TWA. In its Motion, BISD argues that the applicable statute of limitations bars this cause of action.

The TWA establishes a 90-day period for the filing of lawsuits. Specifically, Section 554.005 provides that "a public employee who seeks relief under this chapter must sue not later than the 90th day after the date on which the alleged violation of this chapter: (1) occurred; or (2) was discovered by the employee through reasonable diligence." TEX. GOV. CODE § 554.005. The statute, however, also creates a tolling provision when the employee invokes available grievance procedures. In particular, "[t]ime used by the employee in acting under the grievance or appeal procedures is excluded" from the Section 554.005 time period. *Id*. at § 554.006(c). When an employee initiates a grievance procedure, as Tolman did, the Texas Government Code creates two avenues, each with its own applicable filing deadline. If the grievance does not result in a final decision within 60 days of the initiation of the grievance process, the employee may elect one of two options. First, the employee may exhaust the applicable grievance procedures. If so, the employee must file a lawsuit "not later than the 30th day after the date those procedures are exhausted[.]" *Id*. at § 554.006(d)(1). Alternatively, the employee may "terminate procedures[.]" *Id*. at § 554.006(d)(2). Under this election, the employee must then "sue within the time remaining under Section 554.005[.]" *Id*.

At times, including in the present case, an employee alleges that the employer engaged in numerous wrongful acts that ultimately led to a constructive discharge. In such cases, the constructive discharge gives rise to the cause of action. *See Univ. of Tex. Med. Branch at*

*Galveston v. Hohman*, 6 S.W.3d 767, 774 (Tex. App.—Houston [1st Dist.] 1999, pet. dism'd w.o.j.) (rejecting the employer's argument "that limitations began to run from the instant the nurses believed they were being retaliated against").

According to Tolman, BISD began its retaliatory measures on June 30, 2021, when BISD denied her access to a computer program that she required to fulfill her job responsibilities. (First Am. Compl., Doc. 19, ¶¶ 14–15)  Over the course of about two years, BISD allegedly took various retaliatory measures against Tolman, ultimately leading to her constructive discharge on June 29, 2023.

At the point of the alleged constructive discharge, the violation of the TWA "occurred." The 90-day period to file suit began to run.  Here, however, Tolman had already initiated a grievance procedure based on some of the alleged wrongful conduct that Tolman claims eventually forced her to resign.  Tolman does not allege that she amended her grievance to add a claim of constructive discharge.  But her allegations allow the reasonable inference that any grievance hearings after June 29, 2023, would have considered her claim to have been constructively discharged.  As a result, the Court finds that the grievance procedure that Tolman initiated before June 29, 2023, tolled the limitations period under the TWA as to her alleged constructive discharge.

No final decision was rendered within 60 days of Tolman's initiation of the grievance process, or of her constructive discharge.  As a result, Tolman possessed two options under the TWA.  She could continue the grievance process to completion, and if she ultimately proved unsuccessful, could file her lawsuit within 30 days of exhausting those procedures. *See* TEX. GOV. CODE § 554.006(d)(1).  Or, she could terminate the grievance process and bring suit within the time remaining under Section 554.005, which, in this case, would be the full 90 days. *See id.* at § 554.006(d)(2).

BISD focuses on Tolman's allegations regarding "the conclusion of the May 7, 2024, Level III grievance." (Motion, Doc. 20, 7)  Based on that allegation, BISD argues that under Section 554.006(d)(1), Toman had to file suit within 30 days—i.e., by June 6.  She did not do so until July 1.

Tolman responds that the grievance procedures did not resolve on May 7, as "there remained outstanding, unadjudicated issues . . . following the conclusion of the administrative procedures." (Resp., Doc. 22, 8)  She does not specify those issue, but merely cites to a large portion of her factual allegations. (*See id*. (citing "Paragraphs 24 through 37"))  And as to these unspecified unresolved matters, she neither alleges nor explains in her Response what other procedural avenues she possessed under BISD's grievance procedures.

Based on the record and the applicable law, the Court concludes that the May 7, 2024, event represented the exhaustion of Tolman's grievance.  Under BISD's grievance procedures, the Board resolves Level III grievances.  The Board may decide a matter "orally or in writing at any time up to and including the next regularly scheduled Board meeting." *See* BISD Board Policy Manual.  "If the Board does not make a decision regarding the complaint by the end of the next regularly scheduled meeting, the lack of a response by the Board upholds the administrative decision at Level Two." *Id*.

Here, Tolman identifies an event on May 7, 2024, related to her Level III grievance.  And the Court takes judicial notice that BISD's Board held a regularly-scheduled board meeting on that day.[5]  She characterizes that event as a "conclusion of the . . . Level III grievance[.]" (First Am. Compl., Doc. 19, ¶ 37)  Given that she filed this lawsuit, the Court makes the logical inference that the Board did not rule in her favor.  Under the TWA, she would have 30 days to file a lawsuit based on the adverse result, and she did not file suit within that time period.

---

[5] *See* BISD, Board Meetings and Agendas, May 7, 2024 at 5:30 PM – Regular Board Meeting, https://meetings.boardbook.org/Public/Agenda/2175?meeting=633597 ("Discussion, consideration, and possible action regarding Level III Grievance No. 009/23-24 on M.T.").

Tolman claims that the Board left certain issues unresolved at the May 7 meeting. But she does not identify the unresolved issues, or any further steps that the Board would take concerning her Level III grievance. On the contrary, under BISD's grievance procedures, the Board's "lack of a response" as to any issue on May 7 would "uphold[] the administrative decision at Level Two." *See* BISD Board Policy Manual. Tolman makes no argument explaining why this provision would not control as to the Board's action on her Level III grievance at the May 7 meeting. Thus, the Court concludes that based on Tolman's allegations, the May 7 meeting represented the exhaustion of Tolman's remedies within her grievance process. And she did not file her lawsuit within the applicable deadline, barring her cause of action under the Texas Whistleblower Act.

### C. Equal Pay Act

Tolman also sues under the Equal Pay Act, 29 U.S.C. § 206(d)(1), alleging that BISD's wrongful conduct effectuated her constructive discharge and was "done on the basis of [Tolman's] age, and, more importantly, on the basis of her gender." (First Am. Compl., Doc. 19, ¶ 30) She alleges that BISD replaced her with "a younger male employee, with fewer qualifications."[6] (*Id*. at ¶ 22; *see also id*. at ¶ 40 (alleging that she was replaced with "a less experienced male, who, in turn, received a salary greater than" hers))

BISD moves for dismissal of this claim on the grounds that Tolman fails to plead "appropriate male comparators[.]" (Motion, Doc. 20, 9) In addition, BISD contends that Tolman appears to be alleging a claim for retaliation, which the Equal Pay Act does not encompass. (*Id*.)

To establish a prima facie case under the Equal Pay Act, Tolman must allege that (1) BISD is subject to the Act; (2) she performed work in a position requiring equal skill, effort, and responsibility under similar working conditions; and (3) she was paid less than the employee of the opposite sex providing the comparison. *See Chance v. Rice Univ*., 984 F.2d 151, 153 (5th Cir.

---

[6] Tolman's allegations reference the younger age of the employee who replaced her. The statute, however, does not apply to age-based claims. *See Smith v. City of Jackson, Miss*., 351 F.3d 183, 191 (5th Cir. 2003). To the extent that Tolman alleges an age-based claim under the Equal Pay Act, such a claim would be subject to dismissal.

1993).  As to the second element, a female plaintiff satisfies her pleading obligations by alleging that a male employee replaced her in the same position that she previously held.  *See Plemer v. Parsons-Gilbane*, 713 F.2d 1127, 1137 (5th Cir. 1983) ("In an Equal Pay Act claim, a plaintiff may make her case by comparing her salary to that of her successor.") (citing *Pittman v. Hattiesburg Municipal Separate School District*, 644 F.2d 1071, 1074 (5th Cir. 1981)); *Bourque v. Powell Electrical Manufacturing Co.*, 617 F.2d 61, 64 (5th Cir. 1980) (finding that the plaintiff alleged a prima facie case by comparing her salary to her predecessor's).

Once a plaintiff pleads a viable claim, the burden of proof "shifts to the employer to show that the differential is justified under one of the Act's four exceptions." *Corning Glass Works v. Brennan*, 417 U.S. 188, 196 (1974); *see also Plemer*, 713 F.2d at 1136 ("[T]he burden shifts to the employer once a plaintiff shows that she was paid less than a male who was performing substantially the same job.").  The exceptions include a seniority or merit system, measuring earnings by quantity or quality of production, or a differential based on another factor besides sex. *See Corning Glass Works*, 417 U.S. at 196.  Under these principles, a replacement employee's qualifications and experience bear no relevance as to whether the plaintiff has pled a viable claim, but may prove relevant regarding an employer's reliance on an exception for a disparity in salary.

Here, while Tolman's First Amended Complaint lacks precision, the Court concludes that it presents a viable claim under the Equal Pay Act.  As to the first element, Tolman does not expressly allege that BISD is subject to the statute.  But she advances all of her factual allegations against BISD, and she alleges that its alleged wrongful conduct violated 29 U.S.C. § 206, the Equal Pay Act. (First Am. Compl., Doc. 19, ¶ 39)  At the motion to dismiss stage, a court can make reasonable inferences from well-pleaded allegations.  Here, the Court finds that Tolman

adequately pleads that BISD is subject to the Equal Pay Act.  And the law confirms that it is. *See Marshall v. A&M Consolidated Independent School District*, 605 F.2d 186 (5th Cir. 1979).

As to the second element, Tolman alleges that BISD removed her from the position of Special Programs Director, and then filled that vacant position with a male.  This allegation allows the reasonable inference that the Director position at issue, for both Tolman and the replacement employee, required the same "skill, effort, and responsibility under similar working conditions." BISD appears to dispute that Tolman has adequately pleaded whether the replacement male employee had similar qualifications as Tolman.  Such a comparison, however, does not bear on the pleading requirement for a cause of action under the Equal Pay Act.

Finally, Tolman alleges that the male employee, for the same Director position that she previously held, "received a greater salary than" she did.  It is true that Tolman does not allege the amount of the disparity, but at the motion to dismiss stage, a plaintiff need not provide such specificity.  In addition, "when discoverable information is in the control and possession of a defendant, it is not necessarily the plaintiff's responsibility to provide that information in her complaint." *Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Georgia, Inc.*, 892 F.3d 719, 730 (5th Cir. 2018).  BISD possesses significantly greater access than Tolman to the salary of its employees.  Tolman may require and would be entitled to discovery in order to quantify the discrepancy between her salary as Director and the salary that BISD paid the male employee who replaced her in the same position.

For these reasons, the Court concludes that Tolman alleges a viable cause of action under the Equal Pay Act.

### D.  Section 1983

Tolman alleges two claims under 42 U.S.C. § 1983: a violation of her substantive due process rights under the Fourteenth Amendment, and a "*Monell* claim" for BISD's failure to

supervise its agents, employees, and officers.[7] (First Am. Compl., Doc. 19, ¶¶ 42, 48)  BISD seeks dismissal of each cause of action.

As to her substantive due process claim, Tolman relies on her right "to be free from state actions that deprive her of life, liberty, or property in such a manner as to shock the conscience."[8] (*Id*. at ¶ 42)  BISD contends that Tolman's allegations do not satisfy the "shocks the conscience" standard, and that Tolman's "invocation of the internal BISD grievance process constituted her receipt of due process in response to her complaints." (Motion, Doc. 20, 10)

The Supreme Court has recognized municipal liability under Section 1983 where the execution of a municipal policy or custom inflicts a constitutional deprivation. *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 691 (1978).  A municipality may only be held liable when an action taken pursuant to official municipal policy or custom caused the constitutional violation. *Id.*; *see also Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992).  Thus, to find a school district liable under *Monell*, a plaintiff must establish (1) a policymaker, (2) an official policy, and (3) a violation of constitutional rights "whose 'moving force' is the policy or custom." *Doe v. Edgewood Ind. Sch. Dist.*, 964 F.3d 351, 364 (5th Cir. 2020) (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)).

In matters involving school districts, the board of trustees typically represents the relevant policymaker. *See Rivera v. Houston I.S.D.*, 349 F.3d 244, 247 (5th Cir. 2003) (quoting Tex. Educ. Code § 11.151(b) ("Texas law unequivocally delegates to the Board 'the exclusive power and duty to govern and oversee the management of the public schools of the district.'")).  The plaintiff must identify the challenged policy that the school district's board adopted. *See id*. (noting that plaintiffs must identify a policy that is the "moving force" behind the alleged constitutional

---

[7] As Tolman brings suit only against BISD, and alleges no claims against individuals, the Court will analyze both causes of action under the *Monell* framework for municipal liability.

[8] Tolman fails to identify whether she claims a violation of a life, liberty, or property interest.  Construing her pleading liberally, the Court assumes for purposes of its analysis that Tolman is alleging a property interest in her public employment. (*See* Resp., Doc. 22, ¶ 18 (referencing a property interest))

violation).  A general reference to unspecified policies cannot support a viable claim. *See Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001) ("[E]ach and any policy which allegedly caused constitutional violations must be specifically identified by a plaintiff[.]").  A plaintiff can also base a claim on a "persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *See Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992) (quoting *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984)).  This standard requires "conduct that has become a traditional way of carrying out policy and has acquired the force of law," and "the persistent conduct must be attributable to the source of policy or law of the city, its governing body." *Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984).  The Supreme Court has characterized such customs as "persistent and widespread . . . practices," "systematic maladministration" of the laws, practices that are "permanent and well settled," and "deeply embedded traditional ways of carrying out . . . policy." *Id.* (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 173–74 (1970)).  A plaintiff presents a viable claim under this legal theory by identifying specific examples of the challenged custom being applied in a wrongful manner against various individuals. *See Davidson v. City of Stafford, Texas*, 848 F.3d 384, 396 (5th Cir. 2017) (explaining that a pattern "must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees[,]" and "requires similarity, specificity, and sufficiently numerous prior incidents") (internal citations omitted).

"The guarantee of due process enshrined in the Fourteenth Amendment has two components—(1) a guarantee of procedural protections when a state seeks to deprive an individual of protected liberty or property interests, and (2) a substantive protection against conduct that 'shocks the conscience.'" *Jordan v. Fisher*, 823 F.3d 805, 810 (5th Cir. 2016)) (internal citations

omitted).  To bring a claim for the violation of substantive due process, the plaintiff must identify a life, liberty or property interest, and must allege sufficient facts that, when taken as true, demonstrate that the defendant violated that interest via conduct that "shocks the conscience" to the point that it "violates the decencies of civilized conduct." *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998); *Simi Inv. Co., Inc. v. Harris Cnty., Tex.*, 236 F.3d 240, 249–50 (5th Cir. 2000).

"The burden to show state conduct that shocks the conscience is extremely high, requiring stunning evidence of arbitrariness and caprice that extends beyond mere violations of state law, even violations resulting from bad faith to something more egregious and more extreme." *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 868 (5th Cir. 2012) (quoting *J.R. v. Gloria,* 593 F.3d 73, 80 (1st Cir. 2010)).  The alleged wrongful conduct must rise to a level that "violates the decencies of civilized conduct" and is "so brutal and offensive that it [does] not comport with traditional ideas of fair play and decency[.]" *Doe ex rel. Magee*, 675 F.3d at 867 (quoting *Lewis*, 523 U.S. at 846–47 n. 8); *see also SO Apartments, L.L.C. v. City of San Antonio, Texas*, 109 F.4th 343, 352 (5th Cir. 2024) (explaining that the government's conduct must "interfere[ ] with rights 'implicit in the concept of ordered liberty'") (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987)).  Cases recognizing a viable claim under the "shocks the conscience" standard involve extreme force and serious bodily injury. *See Doe ex rel. Magee*, 675 F.3d at 867–68 (citing cases).

As to Tolman's substantive due process claim, the Court finds that her allegations do not satisfy the "shocks the conscience" standard.  The Court acknowledges that Tolman presents serious allegations of wrongful conduct.  But she does not allege extreme force, dangerous conditions, or bodily injury.  Rather, she claims that BISD engaged in retaliatory conduct that included, *inter alia*, demoting her, reducing her pay, placing her in an old office with the remains of dead animals, and depriving her of access to systems and information that she required to fulfill

her job responsibilities. Such conduct, even when accepted as true, does not represent conduct "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Lewis*, 523 U.S. at 847 n. 8. She offers no authority involving allegations resembling hers, and in which a court recognized a viable cause of action under the governing standard.

Regarding Tolman's "*Monell* claim" based on BISD's alleged failure to supervise its agents and employees, BISD contends that she fails "to identify any official policy or custom[.]" (Motion, Doc. 20, 11) The Court agrees. Tolman identifies no specific policy that BISD's Board adopted and that allegedly caused the violation of her constitutional rights. She fails to allege any other instances in which BISD allegedly engaged in similar wrongful conduct against other individuals, so as to identify a "custom" or "pattern" that could amount to a policy. In the end, Tolman alleges that various BISD employees took retaliatory measures against her when she reported her suspicions of financial malfeasance. She invoked the district's grievance procedures, but proved unsuccessful. The allegation that the Board ultimately disagreed with her claims cannot represent a policy for purposes of an action under Section 1983, and does not amount to a pattern or custom of wrongful conduct.

**IV.    Conclusion**

For these reasons, it is:

**ORDERED** that Defendant Brownsville Independent School District's Motion to Dismiss (Doc. 20) is **GRANTED IN PART AND DENIED IN PART**; and

**ORDERED** that Plaintiff Mary Tolman's claims against Defendant Brownsville Independent School District under the Texas Whistleblowers Act is **DISMISSED WITHOUT PREJUDICE**; and

**ORDERED** that Plaintiff Mary Tolman's claims against Defendant Brownsville Independent School District under 42 U.S.C. § 1983 are **DISMISSED WITH PREJUDICE**.

All other relief not expressly granted is **DENIED**.

Signed on June 18, 2025.

_____
Fernando Rodriguez, Jr.
United States District Judge