United States District Court
Southern District of Texas

**ENTERED**

May 13, 2026

Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| MARY TOLMAN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 1:24-CV-099 |
| | § | |
| BROWNSVILLE INDEPENDENT SCHOOL | § | |
| DISTRICT, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION**

Mary Tolman worked for the Brownsville Independent School District in a position that required her to supervise the allocation and use of federal funds. She persistently reported, both to her supervisors and to the Texas Education Agency, what she viewed as the unlawful misallocation of those funds. She alleges that in response to her complaints, BISD took retaliatory steps against her, including various harassing measures and ultimately reassigning her to a new position that would reduce her compensation in future years. Based on the alleged retaliation, she resigned.

Tolman sued BISD alleging multiple causes of action. The Court dismissed all claims except those based on the whistleblower protections of the National Defense Authorization Act of 2013, 41 U.S.C. § 4712(a)(1), and the Equal Pay Act, 29 U.S.C. 206(d). BISD then moved for summary judgment on these causes of action. On May 4, 2026, the Court granted summary judgment in BISD's favor as to Tolman's claim under the Equal Pay Act, as well as to the bulk of her cause of action based on the NDAA, other than such a claim based on Tolman's reassignment. (*See* Order, Doc. 40) In this Memorandum Opinion, the Court provides the grounds for that ruling.

1 / 17

## I.    Summary Judgment Facts[1]

In 2021, Tolman worked as the Special Programs Director for BISD.  In that position, among other duties, she oversaw the funds that BISD received through the Every Student Succeed Act ("ESSA"), 20 U.S.C. § 6301, *et. seq*.  The federal law dispenses grants to states, who in turn dispense the monies to local school districts for programs designed to assist economically disadvantaged students.  The school district must utilize the funds for the specific purposes for which they are awarded.

On March 24 of that year, Tolman emailed Dr. Nereida Cantu (Deputy Superintendent for Business & Operations) and Dr. Timothy Cuff (Assistant Superintendent, and Tolman's supervisor) with concerns about the use and non-use of ESSA funds.  She expressed that she "remain[ed] extremely concerned with the decisions made by the Deputy for Curriculum and Instruction, in regards to federal funded personnel as well as [the Department's] disregard for conducting and submitting program evaluations for federal funded initiatives/programs." (March Email, Doc. 34–2, 2)  In eight paragraphs, she explained her specific concerns and then communicated her view that the "lack of communication is a result of the Deputy's disregard for program guidelines[.]" (*Id.*)

The following day, the payroll department called Tolman's office "to direct [her] staff to submit [Tolman's] absence of duty reports." (*Id.* at 1)  Tolman understood that "upper administration" and the payroll director had issued the directive. (*Id.*)  A few days later, Tolman emailed Cantu and Cuff to advise them of the request for her absence of duty reports.  She communicated her belief that the payroll director had "issues with the fact [that Tolman had] reported unauthorized journal entries as well as other past issues[.]" (*Id.*)  She expressed her view that the request for her absence of duty report was "retaliation for reporting unallowable uses of federal funds by the District." (*Id.*)

---

[1] The Court construes the competent summary judgment evidence in the light most favorable to Tolman. *Ford, Bacon & Davis, L.L.C. v. Travelers Ins. Co.*, 635 F.3d 734, 736 (5th Cir. 2011).

In April, Tolman asked fourteen BISD employees for updates "on allowing the campuses to begin the process to replace" parent liaisons and various aides for the 2021-2022 school year. (April Email, Doc. 34–3, 2)  She explained that specified funds were "tied to personnel costs for these positions" for the following school year, and reminded them of prohibitions regarding the use of certain positions to calculate staffing ratios. (*Id.*)

Two months later, Tolman met with Dr. Rene Gutierrez, BISD's superintendent, apparently to discuss the subject of her March and April communications.  She emailed him after the meeting, sharing that she "remain[ed] very concern[ed]" about the financial issues and that she had made numerous efforts to resolve them. (June Email, 34–3, 1)  She identified three emails from herself to BISD employees between September 2020 and April 2021, as well as "several verbal efforts[,]" that formed part of her "attempts to keep the District, yourself, and us as funding sources in compliance." (*Id.*)  She shared that "future staffing recommendations" should be communicated in "a timely manner" and that her "[f]inding out stipend increases at the budget hearing (Board Workshop) without considering the major impact on funding is not an appropriate fiscal practice." (*Id.*)  She concluded the message with a "personal note" that she viewed the March 2021 request for her absence of duty reports as "retaliation" for her "intent to keep the District in compliance" with the law concerning federal funds. (*Id.*)

Gutierrez responded almost immediately: "I directed you, personnel department, and payroll to review your concerns and make the necessary adjustments to comply if necessary. Keep me posted that it gets done." (*Id.*)

Less than a week later, Tolman's "access to the TalentED computer program was revoked[,]" even though she required access "to conduct my compliance work as part of my normal job duties" and to view her "own employee personnel files and records."[2] (Tolman Aff.,

---

[2] BISD claims that they revoked the access because the Human Resources Department realized that the program allowed users "to access confidential personnel data." (TEA Response, Doc. 34–6, 2) According to BISD, Tolman "could request that HR run the time and effort reports or she could continue to use the Docu Sign program she had used before." (*Id.*)

Doc. 34–14, ¶ 7)  She later discovered that "around this time[,] BISD falsely opened teacher vacancies–but did not hire teachers–in an attempt to conceal the improper use of the federal funds." (*Id.*)

Beginning on June 30, Tolman "was repeatedly harassed and intimidated by Administrators to improperly switch the designation of personnel to federal Title I, Part A, funds, despite their lack of qualifications for being so designated." (*Id.* at ¶ 8)  She felt "significant" pressure to make this change, leading her to file an administrative grievance "alleging [that] the District's Human Resource Department retaliated against her for pointing out alleged violations of federal funding guidelines." (*Id.*; BISD TEA Resp., Doc. 34–6, 1)  In her grievance, she requested access to TalentED, a higher pay grade, and that her staff be permitted discretionary time off. (BISD TEA Resp., Doc. 34–6, 2)

In mid-July, a meeting occurred to discuss "concerns that Federal funds were being used to supplant the use of local funds for campus staffing." (*Id.* at 1)  The record leaves unclear who participated in the meeting, but it appears that Tolman attended.  "As a result of the meeting, the Superintendent directed that the District make a budget change and 'reimburse' the Federal funding program for funds expended using Fund 255, (Title II funds), with local funds." (*Id.*)

In late August, Tolman requested from Cantu and two other employees "the position control report for 199 funded teachers and staff so [that Tolman could] determine which staff can be funded from 211 for 2021-2022 school year." (Aug. Email, Doc. 34–4, 3)  She reminded them that she had "made several requests since June" for the information. (*Id.*)  Cantu and Tolman exchanged responses to clarify the nature of the requested information, (*see* Email, Doc. 34–4, 2), but Tolman never received the report and "was ultimately forced to submit a Public Information Request for the documents to complete my job duties." (Tolman Aff., Doc. 34–14, ¶ 9)

In September, a Hearing Officer heard Tolman's grievance, concluding that "there was no evidence to support the allegation the HR Department disregarded federal funding guidelines[.]"

(BISD TEA Resp., Doc. 34–6, 2)  The Hearing Officer also denied Tolman's other requests, such as access to TalentED, assuring Tolman that "the District would continue to follow all federal and state guidelines on the use of funding." (*Id.*)

Within a few weeks, Tolman initiated a complaint with the Texas Education Agency, alleging that BISD had "supplant[ed]" federal funds. (TEA Report, Doc. 34–5)  She explained that BISD was using federally-earmarked monies in unauthorized manners, such as by using federal funds to provide "the same services . . . that were provided for in a prior school year using state or local funds[.]" (*Id.* at 2–3)  She also alleged that BISD inappropriately used Title II, Part A, and Title I, Part A funds to meet "local district personnel projections formulas/ratios for the 2020–2021 school year." (*Id.* at 1)

About two weeks after Tolman filed her TEA complaint, BISD accused Tolman of failing to "cooperate with an internal audit [by] withholding documents to BISD's investigation of the misapplied federal funds." (Tolman Aff., Doc. 34–14, ¶ 11 (characterizing the communication as a "letter of reprimand"); *see also* BISD Letter, Doc. 34–7 (indicating that Tolman refused to provide the requested information "without consulting [her] attorney"))  And BISD then submitted its response to the TEA complaint, defending against the accusations and expressing its belief that Tolman had not filed the complaint "in good faith but rather in an attempt . . . to leverage her request for the relief she asked for in the Grievance." (BISD TEA Resp., Doc. 34–6, 2)

In March 2022, Tolman "began receiving reports from within the District of improper changes to job titles and duties, in an improper attempt to once again access federal funding." (Tolman Aff., Doc. 34–14, ¶ 13)  When she reported the issue, she "was excluded from any meetings held to address the discrepancies." (*Id.*)  And at the end of the month, she discovered that "someone within the Administration was overriding accessibility rights to various employee accounts, and, more importantly, began approving these job classification changes without my knowledge or consent." (*Id.*)

On June 22, 2022, Cantu and BISD Staff Attorney Miguel Salinas summoned Tolman to a meeting, at which they informed her that due to "the budget situation[,]" she "was being reassigned to a coordinator position in the Migrant Education Department." (*Id.* at ¶ 15) Cantu told Tolman that the reassignment would not impact her compensation for the 2022-2023 school year, but that her salary would decrease for the 2023-2024 school year, in accordance with that position. (*Id.* at ¶¶ 15, 22) She would also not be eligible for a $12,000 yearly compensation stipend that she previously could earn. (*Id.* at ¶ 15; Grievance, Doc. 34–10, 39) And the decreased compensation would impact her retirement benefits, which the District calculated based on her five highest earning years. (Tolman Aff., Doc. 34–14, ¶ 23; Grievance, Doc. 34–10, 39)

BISD defended the reassignment as part of a larger effort within the district to address funding shortages caused by decreased student enrollment. The Board of Trustees instructed Gutierrez to cut personnel costs, but to do so with minimal impact on classroom instruction and through attrition rather than layoffs. BISD reassigned Tolman when the previous Migrant Coordinator retired, and then moved Tolman's previous duties to J.J. DeLeon, another BISD administrator, who earned considerably less than Tolman. Tolman claims that DeLeon did not possess her level of qualifications and licensures.

BISD also assigned Tolman a new office, which she found "dirty, stale-smelling, with termites, dead roaches, rodents, and their feces on the floor, desk, and drawers, and rodents skeletal remains and fluid stains in my office air-conditioning unit." (Tolman Aff., Doc. 34–14, ¶ 18) After she complained, BISD picked up the rodents, but did not sanitize the office for another 10 days, and delayed over seven months to replace the "soiled, contaminated carpet[.]"[3] (*Id.*)

In October, BISD completed a late employment evaluation for Tolman, for the previous 2021–2022 school year. The evaluation proved "markedly worse than any previous evaluation [Tolman] had received during [her] tenure as Director of Special Programs." (*Id.* at ¶ 21)

---

[3] Tolman immediately filed a grievance regarding her reassignment, but it appears to have been unsuccessful. (Grievance, Doc. 34–10, 64)

Later that month, the District's Chief Financial Officer rejected Tolman's "proposed budget for the Migrant Education Program . . . without explanation." (*Id.*) Previously, the District typically accompanied such a denial with a written explanation.

In November, BISD issued Tolman a "Letter of Concern" that accused her of "making false allegations to various employees within the District." (*Id.*) She believed that the alleged "false allegations" included her "disclosing of the financial irregularities and misappropriation[.]" (*Id.*)

In May 2023, Tolman learned that her salary as a Migrant Coordinator would be $22,000 less than her previous salary. A few weeks later, she received a "below expectations" performance evaluation, even though she had not yet completed a full year as Migrant Coordinator. (Tolman Aff., Doc. 34–14, ¶ 22; Job Eval., Doc. 34–13, 5)

"On June 29, 2023, due to the unreasonable scrutiny, unrelenting pressure due to incessant retaliation, and, ultimately, the financial realities that come with a $22,000 annual pay decrease, along with the loss of a $12,000 stipend[,]" Tolman resigned from BISD. (Tolman Aff., Doc. 34–14, ¶ 23) She remains in "fear for my safety, and the safety of my family, as a result of the actions taken against me by BISD[.]" (*Id.* at ¶ 23)

In July 2024, Tolman filed suit against BISD and eleven individual defendants, all BISD administrators or trustees. In her First Amended Original Petition (Doc. 19), she dismissed the individual defendants by removing them as defendants, retaining claims solely against BISD. She alleged four causes of action: (1) violations of the federal whistleblower protections for employees of federal grantees, 41 U.S.C. § 4712[4]; (2) violations of the Texas Whistleblower Act, Texas Government Code § 554.002; (3) violations of the Equal Pay Act, 29 U.S.C. § 206(d); and (4) a claim under 42 U.S.C. § 1983 for the alleged violation of her substantive due process rights under the Fourteenth Amendment of the Constitution of the United States.

---

[4] Tolman references the "Federal Whistleblower Protection Act" in her pleading, but that statute is codified at 5 U.S.C. § 2302 and does not appear to apply to this case. Tolman cites to 41 U.S.C. § 4712, which Congress passed as part of the National Defense Authorization Act of 2013 ("NDAA"), and which represents the correct basis of Tolman's cause of action.

In June 2025, the Court dismissed all of Tolman's claims except those under the NDAA and the Equal Pay Act. (Order, Doc. 23)  After the close of discovery, BISD moved for summary judgment on these two remaining causes of action. (MSJ, Doc. 29)  On May 4, 2026, the Court granted summary judgment as to the Equal Pay Act and on Tolman's NDAA claim "to the extent that the cause of action is based on an alleged adverse employment action other than the re-assignment of Plaintiff Mary Tolman to the position of coordinator within the Migrant Education Department." (Order, Doc. 40)

## II.    Standard of Review

Under Federal Rule of Civil Procedure 56, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim." *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship*, 520 F.3d 409, 412 (5th Cir. 2008).  "If the moving party meets the initial burden of showing there is no genuine issue of material fact, the burden shifts to the nonmoving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc.*, 738 F.3d 703, 706 (5th Cir. 2013).

## III.    Analysis

Tolman alleges that BISD retaliated against her for reporting the possible misuse of federal funds, in violation of the NDAA whistleblower protections found at 41 U.S.C. § 4712(a)(1).  Specifically, she alleges that in retaliation for her complaints of financial impropriety, BISD revoked her access to TalentED, harassed her, and reassigned her to the position of Migrant Coordinator.  These adverse actions, according to Tolman, forced her to resign in June 2026.  In

8 / 17

addition, she alleges that due to her sex, BISD paid her less than a comparator male employee, in violation of the Equal Pay Act, 29 U.S.C. § 206(d).

BISD moved for summary judgment on several grounds. As to Tolman's NDAA claim, it contested that Tolman suffered an adverse employment action, arguing that BISD reassigned Tolman as part of a district-wide plan to reduce administrative costs, rather than as a retaliatory measure. With respect to Tolman's Equal Pay Act claim, BISD submitted evidence that BISD always paid Tolman a higher salary than DeLeon, the comparator who she identifies, negating the prima facie case for a pay discrimination claim.

### A.  NDAA Whistleblower Claim

The NDAA "prohibits any recipient of federal dollars from retaliating against whistleblowers who report an abuse of that money." *Tex. Educ. Agency v. United States Dep't of Educ.*, 992 F.3d 350, 353 (5th Cir. 2021); *see also Beltran v. Lockheed Martin Corp.*, No. 25-10808, 2026 WL 788905, at *1 (5th Cir. Mar. 20, 2026) (per curiam) (unpubl.) ("Congress enacted a broad-based whistleblower protection program as part of the NDAA, . . . shielding employees of contractors from being discharged, demoted, or otherwise discriminated against as a reprisal for whistleblowing.") (cleaned up). The NDAA provides employees of federal grantees and contractors a private right of action against an employer who retaliates against them for "disclosing information about regulatory violations[.]" *Wright v. Common Ground Health Clinic, Inc.*, No. CV 16-11623, 2016 WL 4720011, at *3 (E.D. La. Sept. 9, 2016); *see also* 41 U.S.C. § 4712(a)(1) (establishing that "[a]n employee of a contractor, . . . may not be discharged, demoted, or otherwise discriminated against as a reprisal" for specified protected activity).

To prevail on a NDAA retaliation claim, an employee must establish a prima facie case of retaliation by showing: "(1) she made a protected disclosure to a person specified in the statute, (2) she suffered an adverse employment action, and (3) the protected disclosure was a

contributing factor in the adverse employment action." *Beltran*, 2026 WL 788905, at *2 (cleaned up).

Once an employee satisfies the elements for a prima facie case of retaliation, "the [employer] can then demonstrate, by clear and convincing evidence, that it would have taken the same personnel action despite the protected activity." *Monden v. Consol. Nuclear Sec., L.L.C.*, No. 23-10553, 2024 WL 1007458, at *2 (5th Cir. Mar. 8, 2024) (unpubl.).  The Fifth Circuit has characterized such an argument as an "affirmative defense[.]" *Beltran*, 2026 WL 788905, at *2; *see also Monden*, 2024 WL 1007458, at *2 (recognizing that the contractor bears the burden on this issue).

The employer meets this burden through the factors that the Federal Circuit established in *Carr v. Social Security Administration*, 185 F.3d 1318, 1323 (Fed. Cir. 1999). *See Monden*, 2024 WL 1007458, at *3; *Beltran*, 2026 WL 788905, at *2.[5]  Those factors include "the strength of the employer's evidence in support of its personnel action; the existence and strength of any motive to retaliate on the part of the personnel who were involved in the decision; and any evidence that the employer takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated." *Monden*, 2024 WL 1007458, at *3.  A court considers "the *Carr* factors in the aggregate considering all the pertinent evidence in the record, and despite the evidence that fairly detracts from that conclusion." *Beltran*, 2026 WL 788905, at *2 (cleaned up). The employer need not "prove all three of the factors by clear and convincing evidence[,]" but prevails if the evidence shows that it would have taken the same action even if the employee had not reported possible financial misconduct. *Beltran*, 2026 WL 788905, at *2–3 (citing *Whitmore v. Dep't of Labor*, 680 F.3d 1353, 1374 (Fed. Cir. 2012)); *see also Monden*, 2024 WL 1007458, at

---

[5] The Fifth Circuit recently recognized that "scant interpretive caselaw" exists regarding the "relatively new[ ]" NDAA. *Beltran*, 2026 WL 788905, at *1 n.2.  As a result, this Court relies on unpublished Fifth Circuit decisions, which in turn "draw upon the analytical frameworks of other federal whistleblower provisions" and on caselaw from other circuits. *Id.*

*2 (affirming summary judgment for the employer because "each of the *Carr* factors weigh[ed] decisively" in its favor).[6]

In the present case, BISD argues that Tolman "cannot show adverse employment or constructive discharge[.]" (MSJ, Doc. 29, 6)  In other words, BISD challenges Tolman's ability to demonstrate a prima facie case, focusing its attack on the second element for such a case–i.e., that the employee suffered an adverse employment action.  In support of this position, BISD explains that it reassigned Tolman as part of a "districtwide reorganization necessitated by a substantial reduction in [student attendance] and the resulting loss of state funding." (MSJ, Doc. 29, 6)  BISD reiterates this argument in its Reply, emphasizing that Tolman offers no evidence to rebut the proffered non-discriminatory reasons for the reassignment. (*See* Reply, Doc. 39, 2)  In addition, BISD claims that no evidence reflects "objectively intolerable working conditions" that would have compelled Tolman to resign, negating, according to BISD, that she can claim constructive discharge as an adverse employment action. (MSJ, Doc. 29, 7)

Tolman responds that the Court should "reject Defendant's narrow view and interpretation of the 'adverse employment action' at issues for the NDAA[.]" (Response, Doc. 34, 8)  She identifies several events that she claims represent adverse employment action: 1) the revocation of her access to the TalentED program; 2) her being "continually subjected to harassment and intimidation by Administrators"; 3) the formal letter of reprimand; 4) her poor annual evaluation; and 5) her reassignment to the position of Migrant Coordinator. (Response, Doc. 34, 6)  She also claims that all these actions forced her to resign–i.e., a constructive discharge.

The Fifth Circuit has not addressed what circumstances qualify as an adverse employment action for purposes of the NDAA.  The statute does not utilize the phrase, but establishes that an employee "may not be discharged, demoted, or otherwise discriminated against as a reprisal" for protected activity.  Given the statutory language, the Court concludes that an adverse employment

---

[6] Neither party cites the *Carr* factors, but the Court finds that they represent the governing standard, both for purposes of the summary judgment motion and for trial of the NDAA claim.

action must fall within the categories encompassed by "discharged, demoted, or otherwise discriminated against[.]" The statute does not define these terms, and no caselaw appears to have addressed their contours. Thus, the Court applies the generally understood meaning of the words and phrases. *See Cascabel Cattle Co., L.L.C. v. United States*, 955 F.3d 445, 451 (5th Cir. 2020) ("Words in statutes are typically construed according to their ordinary, contemporary, common meanings.") (cleaned up).

A discharge represents the "firing of an employee." DISCHARGE, *Black's Law Dictionary* (12th ed. 2024). The same source indicates that a constructive discharge is the "employer's creation of working conditions that leave a particular employee or group of employees little or no choice but to resign, as by fundamentally changing the working conditions or terms of employment[.]" DISCHARGE, *Black's Law Dictionary* (12th ed. 2024); *see also Yarbrough v. SlashSupport, Inc.*, 152 F.4th 658, 665 (5th Cir. 2025) (noting that for a Section 1981 retaliation claim, an allegation of constructive discharge requires the plaintiff to show that "a reasonable party in his shoes would have felt compelled to resign").

As to the meaning of "demoted[,]" a demotion is generally understood as lowering a person "in rank, position, pay, or other status." DEMOTE, *Black's Law Dictionary* (12th ed. 2024); *see also* DEMOTION, Oxford English Dictionary (July 2023) ("The action of demoting a person or (less commonly) a thing; reduction in position, rank, or status."). The definition confirms that a change in position resulting in a pay cut typically qualifies as a demotion. In addition, the Fifth Circuit has reasoned that "[t]o be equivalent to a demotion, a transfer need not result in a decrease in pay, title, or grade; it can be a demotion if the new position proves objectively worse—such as being less prestigious or less interesting or providing less room for advancement." *See Sharp v. City of Houston*, 164 F.3d 923, 933 (5th Cir. 1999); *see also Alvarado v. Tex. Rangers*, 492 F.3d 605, 613 (5th Cir. 2007), *abrogated on other grounds by Hamilton v. Dallas Cnty.*, 79 F.4th 494 (5th Cir. 2023) (reversing summary judgment on a failure to promote claim where the plaintiff

presented evidence that the new position she was denied was objectively more prestigious than her current position).

The phrase "otherwise discriminated against" also finds no clear definition in caselaw. The parties cite to caselaw applying Title VII, 42 U.S.C. § 2000e-3, *et seq*. That statute contains an "antidiscrimination provision [that] seeks a workplace where individuals are not discriminated against because of their racial, ethnic, religious, or gender-based status." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006). In addition, the statute includes "antiretaliation provision [that] seeks to secure that primary objective by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." *Id*. The Supreme Court has construed the antiretaliation provision as providing "broader protection" than the substantive provision. *Id*. at 66. In this context, the Supreme Court reasoned that to show that an employer "discriminated against" her under Section 2000e-3, the employee "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*. at 68 (cleaned up); *see also Wooten v. La Salle Corr*., 748 F. Supp. 3d 1363, 1378 (M.D. Ga. 2024) (explaining that Section 4712 prohibits "intentional conduct by an employer that treats a disclosing employee worse because of her disclosure"); *Bass v. Bd. of Cnty. Com'rs, Orange Cnty., Fla*., 256 F.3d 1095, 1118 (11th Cir. 2001) (reversing summary judgment as to a Title VII retaliation claim, because the employer denied the employee overtime opportunities, adversely affecting his future opportunities with the company). The Court finds that the NDAA's prohibition of "otherwise discriminating" against employees for whistleblowing includes an employer's actions that would probably dissuade a reasonable employee from reporting suspected misuse of federal funds.

In the present matter, based on the ordinary meaning of "demoted" under the NDAA, Tolman's reassignment to Migrant Coordinator qualifies as an adverse employment action for

purposes of the prima facie case.  The reassignment did not alter Tolman's compensation for the 2022–2023 school year, but would decrease her salary materially beginning in the 2023–2024 school year.  She also lost eligibility for the $12,000 stipend that she had available in her previous position.   Such a reduction in pay, even if not immediate, would render the new position "objectively worse" than her prior one.  BISD argues that Tolman's salary in her new position would have increased in future years "as a result of districtwide pay adjustments[.]" (MSJ, Doc. 29, 7)  But BISD fails to show that any future increases were guaranteed, that Tolman knew of them, or that such increases would have offset the overall material decrease in Tolman's compensation. And even if the reassignment did not qualify as a demotion, it would fall within the "otherwise discriminated against" provision of the NDAA, as such a reassignment, with the changes to compensation and responsibilities, would dissuade a reasonable employee from reporting misconduct.

BISD also disputes that the reassignment represents an adverse employment action by submitting evidence identifying non-discriminatory reasons for Tolman's change in position. (*See* MSJ, Doc. 29, 6; Reply, Doc. 39, 7 ("Plaintiff has utterly failed to dispute Defendant's explanation")) This evidence, however, does not negate whether the reassignment qualifies as an adverse employment action for purposes of the prima facie case.  At most, the evidence would bear on BISD relying on the *Carr* factors to show, by clear and convincing evidence, that it would have reassigned Tolman despite her complaints and other protected activity.  In its Motion, however, BISD neither cites to *Carr* nor contends that it is entitled to summary judgment at the second stage of the applicable analysis.  Rather, the only reasonable construction of BISD's Motion is that BISD disputes that Tolman has demonstrated a prima facie case.  And as to that

challenge, whether BISD possessed non-discriminatory reasons for the reassignment proves irrelevant.[7]

As a result, the Court concludes that Tolman has established a prima facie case as to an NDAA claim based on her reassignment to the position of Migrant Coordinator.

As for the other BISD actions that Tolman identifies as adverse employment actions, the Court concludes that they do not qualify as such.  Tolman fails to show that the revocation of her access to TalentED meaningfully impacted her ability to complete her duties.  She presents only vague allegations of harassment and intimidation.  What she characterizes as a "letter of reprimand" was a BISD directive for her to "fully cooperate with the Internal Audit Department and any District department" charged with investigating the misuse of federal funds that she herself alleged. (Robledo Letter, Doc. 34–7)  A request by BISD for her to cooperate with the investigation of her allegations does not represent an adverse employment action.  And her job evaluations, with no apparent accompanying repercussions, also fall short of the standard.

As a result, with respect to the BISD actions on which Tolman relies as an adverse employment action, other than her reassignment, the Court concludes that BISD is entitled to summary judgment because those events and actions, based on the summary judgment record in this case, cannot form the basis of a prima facie case under the NDAA.

### B.  Equal Pay Act

Congress enacted the Equal Pay Act to "prohibit[ ] discrimination in employment, including compensation, on the basis of sex." *Lindsley v. TRT Holdings, Inc.*, 984 F.3d 460, 466 (5th Cir. 2021).  The statute prohibits employers from discriminating on the basis of sex by paying one employee less than another employee for "equal work" that requires "equal skill, effort, and responsibility" and is performed under "similar working conditions." 29 U.S.C. § 206(d)(1).

---

[7] Even if BISD had argued that it satisfied the *Carr* factors, the Court would disagree.  Viewing the summary judgment record as a whole, a genuine issue of material fact would exist as to whether BISD had demonstrated the *Carr* factors by clear and convincing evidence.

Courts apply a version of the *McDonnell-Douglas* shifting-burden analysis when considering a cause of action under the Equal Pay Act. *Lindsley*, 984 F.3d at 466. The employee bears the initial burden of making a prima facie case of unequal pay. To do so, the employee "must show that she performed work in a position requiring equal skill, effort and responsibility under similar working conditions, and that she was paid less than members of the opposite sex." *Lindsley*, 984 F.3d at 466 (cleaned up) (quoting *Jones v. Flagship Int'l*, 793 F.2d 714, 722–23 (5th Cir. 1986)). An employee's failure to identify a co-worker of the opposite sex who the employer paid more proves fatal to a prima facie case under the Equal Pay Act. *See Vasquez v. El Paso Cnty. Cmty. Coll. Dist.*, 177 F. App'x. 422, 425 (5th Cir. 2006) (unpubl.) (affirming summary judgment because the employee "has not pointed to any evidence that suggests a female in a similar position earned a higher wage than he did").

"Once [an employee] has made her prima facie case by showing that an employer compensates employees differently for equal work, the burden shifts to the [employer] to prove by a preponderance of the evidence that the wage differential is justified under one of the four affirmative defenses set forth in the Equal Pay Act: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor than sex." *Siler-Khodr v. Univ. of Tex. Health Sci. Ctr. San Antonio*, 261 F.3d 542, 546 (5th Cir. 2001). Under this standard, the employer bears the burden of persuasion, in contrast to the burden of production that applies under the *McDonnell-Douglas* standard for Title VII cases. *See King v. Univ. Healthcare Sys., L.C.*, 645 F.3d 713, 724 (5th Cir. 2011).

In the present case, BISD argues that Tolman has failed to identify a male comparator who received greater compensation than she did, and that the comparator who she identifies earned less than she did. In addition, BISD contends that Tolman's poor performance justified her lower pay.

Tolman initially responded that BISD failed to submit summary judgment evidence reflecting the comparator's lower salary.[8]  At the time of the filing, this argument was accurate, but due only to BISD's inadvertent failure to submit the supporting affidavit for the salary information.  BISD has rectified the omission. (*See* Motion, Doc 36; Order, Doc. 38)

After reviewing the competent summary judgment evidence, the Court finds that it confirms that the comparator who Tolman identifies–i.e., J.J. DeLeon–earned less than Tolman for the relevant time period.  During the final four years of Tolman's employment, she earned between $125,579 and $129,940.  DeLeon, who absorbed Tolman's duties upon her reassignment, earned $98,044.12 for the 2023-2024 school year, and earned considerably less in his prior positions.  Thus, even assuming that DeLeon represents a proper comparator, at no point did he earn a salary greater than Tolman.

Tolman does not controvert the salary data that BISD submits.  As a result, Tolman fails to create a prima facie case, as she cannot show that she was paid less than a male employee who qualifies as an appropriate comparator.  Her failure defeats her cause of action based on the Equal Pay Act.

## IV.   Conclusion

For these reasons, the Court concludes that BISD is entitled to partial summary judgment, as indicated in the Court's Order (Doc. 40).

Signed on May X, 2026.

_____
Fernando Rodriguez, Jr.
United States District Judge

---

[8] Tolman also disagrees that she provided poor job performance, but the Court need not reach this issue to resolve the Motion as to the Equal Pay Act claim.